In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-05-00001-CR
______________________________


TERRELL KINYON DAVIS, Appellant
 
V.
 
THE STATE OF TEXAS, Appellee


                                              

On Appeal from the 354th Judicial District Court
Hunt County, Texas
Trial Court No. 21,854


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Justice Ross


O P I N I O N

          Terrell Kinyon Davis appeals from his convictions by a jury for five separate offenses
arising from two transactions. All five cases were tried together, and the appeals are
brought on a single record. The appeals in our cause numbers 06-05-00001-CR and
06-05-00002-CR are from Davis' convictions for aggravated kidnapping and aggravated
robbery, respectively, alleged to have been committed during the first transaction. The
remaining three appeals are from Davis' convictions for offenses alleged to have been
committed during the second transaction: aggravated assault with a deadly weapon in
each of the causes numbered 06-05-00003-CR and 06-05-00004-CR, and felon in
possession of a firearm in cause number 06-05-00005-CR. Each of the five indictments
alleged one prior felony conviction for enhancement purposes. Davis pled not guilty to
each indictment, and pursuant to his election, the trial court assessed punishment in each
case. The court sentenced Davis to forty-five years' imprisonment in each of the first four
cases and twenty years' imprisonment in the fifth case. The jury made an express finding
in each of the first four cases "that a deadly weapon, to wit: a firearm, was used or
exhibited in the commission of the offense . . . or the immediate flight therefrom." The trial
court made a similar deadly weapon finding in the fifth case. The punishments in all five
cases run concurrently. Each appeal is disposed by a separate opinion issued of even
date. 
          In the present appeal, Davis was convicted for the aggravated kidnapping of Thera
Phelps. In the companion to this appeal (06-05-00002-CR), he was convicted of
aggravated robbery of the same person. Davis contends that the trial court erred by
denying his motion to suppress evidence of his identification as the actor and that the
evidence of his identity is legally and factually insufficient to support the verdict. The same
issues are raised in the companion case in which he was also convicted of aggravated
robbery. 
          Because all five cases were tried together and the evidence concerning both
transactions was presented to the same jury, we summarize that evidence before
addressing Davis' contentions of error.
THE FIRST TRANSACTION 
(Aggravated Kidnapping and Aggravated Robbery) 
          The kidnapping and robbery occurred June 15, 2003, at about 12:30 a.m. The
evidence shows that a man dressed in all black clothing, including a mask, accosted Thera
Phelps, a Burger King employee, after she had closed the business and gone home. As
she was getting out of her car, this person dressed in black appeared, held Phelps at
gunpoint, got into her car, and ordered her to return to the store for the money. On arrival
at the store, he ordered Phelps to turn off the alarm, open the safe, and give him the
money, which she did. The two re-entered Phelps' car and she drove, at his directions, to
a particular location not far from her home, where he got out of the car and ran away. The
encounter lasted fifteen to twenty minutes. Phelps testified she could not identify her
assailant, not even his racial group, from his appearance. 
          After Davis was arrested three months later, officers recorded his voice and played
the recording for Phelps without comment or explanation. Detective Warren Mitchell
testified that, without any hesitation or doubt, Phelps identified the voice as belonging to
the person who had kidnapped her and robbed her business. Phelps testified at trial she
had no doubt the voice on the recording was that of her assailant.
THE SECOND TRANSACTION 
(Aggravated Assaults and Unlawful Possession of a Firearm by a Felon) 
          The aggravated assaults occurred September 15, 2003, at about 12:50 a.m. The
evidence shows that a man dressed in all black clothing, including a black ski mask and
black gloves, and carrying a gun, accosted Tevas Jackson, a Church's Chicken store
manager, after she had closed the business and gone home. He met Tevas


 at her car
and ordered her back in. She declined and screamed. He hit her with the gun while she
continued to scream. Her daughter, LaKendra Jackson, came out of the house and also
saw the assailant. At that point, the assailant pointed the gun at LaKendra and either told
her "shut up" or "don't move." LaKendra retreated inside the house, and the assailant ran
away. 
          Two officers, who were already responding to a different call in the immediate area,
heard Tevas screaming and reached her immediately after the assault. Two other officers
arrived promptly, and they all set up a perimeter around the immediate area and began
searching for the assailant. Officer Adrian Guzman heard a car alarm activate in a carport
located in close proximity, and he saw a person, dressed in all black clothing, running in
front of the car parked in the carport. Guzman gave chase and caught the person, who
was immediately identified by a fellow officer—and who was identified in court by
Guzman—as Davis. Davis had gloves and a black shirt in his hand that he dropped to the
ground when Guzman caught him. Officers searched the carport where the car alarm
activated and found a loaded pistol tucked behind a refrigerator on top of its motor. 
Guzman testified that the persons who lived at the residence told him the weapon did not
belong to them.
BOTH TRANSACTIONS
          The evidence shows that, when Davis got out of Phelps' car to run away following
his abduction and robbery of her, he was within only a few yards of the place where he was
caught by Guzman after his assaults on Tevas and her daughter. Phelps and Tevas lived
within a block of each other, and the record indicates Davis lived near both of them.
VOICE IDENTIFICATION
          Davis' points of error focus exclusively on the evidence identifying him as the actor
in this prosecution. He first contends the court erred by denying his motion to suppress
Phelps' identification of his voice. Davis casts his argument as an identification issue,
seeking to have it analyzed in the same way as a photographic lineup, complaining about
the procedure followed by the police in playing a tape for Phelps with only his voice on it. 
The State has not addressed the issue as presented, but treats the admissibility of the
identification as any other piece of evidence. 
          The authorities controlling an identification analysis typically involve photographic
lineups, occasionally with a vocal component—as in requiring the members of the lineup
to repeat some key phrase. There is no Fifth Amendment question raised in this case, and
counsel has correctly acknowledged that a defendant may be required to speak words
uttered by a robber as part of the identification process.


 
          Davis contends the pretrial identification procedure was so tainted as to make the
identification unreliable, and thus the court should not have admitted the evidence. He
argues that the procedure and resulting identification were unreliable because the victim
was not able to describe and give characteristics of the voice at trial, because it was over
three months between the attack and the time she heard the audiotape, and because no
other voices were presented to her in a type of vocal lineup. Based on these grounds,
Davis asks us to conclude that, because the pretrial identification was impermissibly
suggestive, it should have been suppressed.
          The general rule is that the Due Process Clause of the Fourteenth Amendment
prohibits the use of identification testimony from a witness who was subjected to an
impermissibly suggestive pretrial identification procedure. Stovall v. Denno, 388 U.S. 293
(1967). The reason for the rule is the substantial likelihood of misidentification that
suggestive procedures may engender. Webb v. State, 760 S.W.2d 263, 269 (Tex. Crim.
App. 1988); Roberts v. State, 923 S.W.2d 141, 144 (Tex. App.—Texarkana 1996, pet.
ref'd). If the totality of the circumstances reveals no substantial likelihood of
misidentification, even though the procedure was impermissibly suggestive, the court will
consider the identification testimony reliable. Reliability is the linchpin in determining the
identification testimony's admissibility. Webb, 760 S.W.2d at 269; Roberts, 923 S.W.2d
at 144.
          Further, the analysis requires an examination of the totality of the circumstances
surrounding the identification. Barley v. State, 906 S.W.2d 27, 33–34 (Tex. Crim. App.
1995). Suggestiveness may arise from the manner in which a pretrial identification
procedure is conducted. Id. For example, a police officer may point out the suspect or
suggest that a suspect is included in a lineup or photographic array. Id. Also, the content
of a lineup or photographic array itself may be suggestive if the suspect is the only
individual who closely resembles the description given by the witness. Id. Also, an
individual procedure may be suggestive or the cumulative effect of procedures may be
suggestive. Id.; Page v. State, 125 S.W.3d 640, 647 (Tex. App.—Houston [1st Dist.] 2003,
pet. ref'd).
          Although (as mentioned above) there are a number of cases involving both visual
and vocal identifications of a defendant, counsel has directed us to no specific authority
discussing this situation—where only a vocal identification is made—and we are aware of
none. Because the sole purpose of the use of the tape recording of Davis' voice was the
same as a photograph of Davis would have been had Phelps been able to attempt
identification from appearance, we will apply the same types of strictures as are used in
the more typical situation.



          Initially, we recognize that a single photograph "lineup" is considered improperly
suggestive and is to be viewed with suspicion. Manson v. Brathwaite, 432 U.S. 98, 109,
117 (1977); Delk v. State, 855 S.W.2d 700, 706 (Tex. Crim. App. 1993). A suggestive
identification scenario, such as a single photograph lineup, is disapproved because the
suggestive lineup increases the likelihood of misidentification. Neil v. Biggers, 409 U.S.
188, 199 (1972). A two-step analysis is used to determine the admissibility of an in-court
identification. First, the photographic display cannot be impermissibly suggestive. Second,
based on the totality of the circumstances, the suggestive display cannot give rise to a
"substantial likelihood of irreparable misidentification." Delk, 855 S.W.2d at 706; see
Simmons v. United States, 390 U.S. 377, 384 (1968). The core issue is "whether under
the 'totality of the circumstances' the identification was reliable even though the
confrontation procedure was suggestive." Neil, 409 U.S. at 200.
          Although we recognize that analysis of an identification of a voice differs from that
of an identification by sight, the standards used to validate a visual identification provide
considerable guidance. In evaluating the likelihood of misidentification caused by the
corrupting effect of any suggestive identification procedure, we are to consider (1) the
witness' opportunity to view the assailant at the time of the crime; (2) how much attention
the witness was paying to the assailant; (3) the accuracy of the witness' description of the
assailant; (4) the level of certainty the witness demonstrated at the confrontation; and
(5) the time between the crime and the confrontation.


 Webb, 760 S.W.2d at 269; see Neil,
409 U.S. at 199–200; Johnigan v. State, 69 S.W.3d 749, 752 (Tex. App.—Tyler 2002, pet.
ref'd). Although not preferred, single person identification lineups have been held
constitutionally admissible. Neil, 409 U.S. at 195.


 
          In this case, Phelps was in the immediate presence of her assailant for
approximately fifteen to twenty minutes. She testified that she heard him speak quite a bit
while giving her instructions and that he was immediately beside her the entire time. 
Because the victim had ample opportunity to hear the assailant and because her attention
was focused on him during the encounter, the first two considerations are satisfied.
          The third factor, the accuracy of the prior description of the voice of her assailant,
fails completely. Phelps had provided the police with no prior description of Davis' voice
and, at the pretrial suppression hearing, was unable to articulate any particular identifiable
factors concerning his voice. 
          In the fourth consideration, the evidence shows that, when Phelps heard the voice,
she exhibited a high level of certainty the voice she heard was that of her assailant. The
officer who had played the audiotaped conversation for Phelps testified that, when he
played the tape:
A.She listened, looking at me. She looked down, she - her hands
began to shake, she tried to speak but her voice was just - she couldn't talk. 
Tears come [sic] from her eyes, ran down her cheeks. And I asked her what
was wrong. She said, that's him. And I asked, that's who? She said, that's
the guy that made me go back to the store.
 
                     Q.       Did she seem uncertain at all?
 
                     A.       No.
 
Q.And you'd call it a very strong emotional reaction she had to the
sound of his voice?
 
                     A.       Probably the strongest I've seen.


          At trial, Phelps was emphatic both on direct and cross-examination that she had
immediately recognized the voice on the tape as that of her assailant and that she was
certain it was the same voice.
          The final factor, the length of time that had elapsed, is weaker. Three months had
elapsed between the date of the kidnapping and robbery and the date when Phelps heard
the audiotape. There had been some time for her memory to fade. Her testimony, and
that of the officer, about Phelps' instantaneous recognition of the voice, however, was
absolutely unequivocal. 
          We also note that, in this instance, the officer carefully did not tell Phelps what
recording he was playing for her, or why. He testified, as did she, that she was unaware
of the possibility that she might hear the voice of the kidnapper, and that her reaction was
immediate and powerful. This is a consideration that would not easily arise in a case
involving a photograph, simply because of the nature of the media. The recording itself
was not part of an interrogation and was of a casual conversation between the officer and
Davis; thus, it would not have provided any hint of its purpose. 
          It can be argued Phelps might assume the reason she was asked to come to the
police station was because the police had some lead in connection with her abduction and
robbery, but in light of the officer's reticence, it does not necessarily follow that Phelps was
expecting to hear the voice of her assailant on the audiotape. This differs from the more
typical situation where an officer hands a photograph to a victim combined with a query as
to whether it was a photograph of the actor.



          The standard of review requires a reviewing court to consider the factors, which are
all issues of historical fact, deferentially in a light favorable to the trial court's ruling. "The
factors, viewed in this light, should then be weighed de novo against 'the corrupting effect'
of the suggestive pretrial identification procedure." Loserth v. State, 963 S.W.2d 770,
773–74 (Tex. Crim. App. 1998). The reviewing court must view the historical facts in a light
most favorable to the court's ruling if the trial court does not make express findings of
historical facts. Id. at 774. The trial court did not make any express findings of historical
facts, so we view the historical facts in a light most favorable to the court's ruling. 
          A defendant bears the burden of establishing by clear and convincing evidence that
the pretrial identification procedure was impermissibly suggestive. Barley, 906 S.W.2d at
33–34. The analysis requires an examination of the totality of the circumstances
surrounding the identification. Id. at 33; Mayfield v. State, 152 S.W.3d 829, 832 (Tex.
App.—Texarkana 2005, pet. ref'd); Morrow v. State, 139 S.W.3d 736, 741 (Tex.
App.—Texarkana 2004, no pet.). 
          Although we believe the better practice would be to provide several similar voices
in the identification procedure, considering the totality of the circumstances in the light most
favorable to the court's determination, we do not find the procedure followed here to be
impermissibly suggestive.


 We also note there were actually two voices on the recording
(Davis and the police officer), neither of which was identified to Phelps before the tape was
played. We cannot say, based on the standard set out above, the court's determination
that the procedure was not impermissibly suggestive was reversible error. The contention
of error is overruled.
LEGAL AND FACTUAL SUFFICIENCY
          Davis also contends the evidence is legally and factually insufficient to support the
verdict. In reviewing the legal sufficiency of the evidence, we view the relevant evidence
in the light most favorable to the verdict and determine whether any rational trier of fact
could have found the essential elements of the crime beyond a reasonable doubt. 
Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000). In reviewing the factual
sufficiency of the evidence, we are required to determine whether, considering all the
evidence in a neutral light, the jury was rationally justified in finding guilt beyond a
reasonable doubt. Zuniga v. State, 144 S.W.3d 477, 484 (Tex. Crim. App. 2004). 
          Davis contends the evidence is insufficient because his identity was proven only by
Phelps' testimony that she recognized his voice. The weight of that testimony, however,
was for the jury to assess. There are cases holding that identifications by voice are
sufficient to support a verdict. Locke v. State, 453 S.W.2d 484, 485 (Tex. Crim. App.
1970); see McInturf v. State, 544 S.W.2d 417, 419 (Tex. Crim. App. 1976). Further, in this
case, the evidence of the second transaction, in light of the identical methods used, dates
of the month, times of the night, clothing worn, proximity of the victims to each other and
to the defendant's residence, provide some evidence to support the verdict. 
          Both transactions were prosecuted in the same trial. Evidence of both transactions
was admitted without objection. The State offered the evidence of the assaults in the
second transaction to prove identity based on a similar modus operandi. For such
evidence to be admissible, identity must be an issue in the case. Johnson v. State, 68
S.W.3d 644, 650–51 (Tex. Crim. App. 2002). When an extraneous offense is offered to
prove identity, the common characteristics or the device used in each offense must be so
unusual and distinctive as to be like a "signature." Collazo v. State, 623 S.W.2d 647, 648
(Tex. Crim. App. [Panel Op.] 1981). Signature features must consist of more than mere
repeated commissions of the same class of crimes such as burglaries or robberies. 
Owens v. State, 827 S.W.2d 911, 915 (Tex. Crim. App. 1992); Pena v. State, 867 S.W.2d
97, 99 (Tex. App.—Corpus Christi 1993, pet. ref'd). In this case, as previously set out, the
modus operandi was identical, down to the time of night of the attacks, the location of both
attacks were within a block of each other, and even the clothing worn was precisely the
same type in both instances. Thus, the evidence was relevant and could be admitted
because the sufficiently distinctive common characteristics between the extraneous
offense and the charged offense earmarked both as the accused's handiwork. Owens,
827 S.W.2d at 914–15. 
          The evidence is probative on the issue of identity, which was the key issue in the
prosecution based on the first transaction. See Taylor v. State, 920 S.W.2d 319, 322 (Tex.
Crim. App. 1996) (relying in part on evidence that defendant had committed a near-identical earlier crime as evidence of identity); Bryant v. State, 656 S.W.2d 513, 517 (Tex.
App.—Beaumont 1983, pet. ref'd) (relying on distinctive modus operandi of rapist in other
attacks as evidence of identity). Based on this evidence, and on the identification by the
victim of the voice of her assailant, and the complete lack of evidence to the contrary, we
conclude the evidence is both legally and factually sufficient to support the verdict.
DEADLY WEAPON FINDING
          Davis also contends the evidence is insufficient to support the jury's deadly weapon
findings in its verdicts finding him guilty of aggravated kidnapping, aggravated robbery, and
the two aggravated assaults. He does not challenge the deadly weapon finding made by
the trial court in its judgment in the felon in possession of a firearm case. 
          Davis challenges the deadly weapon finding in the first four cases because no
weapon was recovered and there was no specific evidence provided to the jury adequately
describing the type of weapon. Davis focuses on the lack of any evidence that the gun was
actually a firearm (or if it was a toy or air pistol), and if it was a firearm, whether it was
loaded or capable of being fired. 
          The allegation in this case was that a firearm was used. By definition, that is a
deadly weapon. Tex. Pen. Code Ann. § 1.07(17) (Vernon Supp. 2005). The only
information about the item is found in Phelps' testimony. In connection with the gun, she
testified that, when she started to get out of her car at home, the gun was "just right there"
and that she was fixated on it from that point. She testified that the gun was pointed at her
and that she was afraid she was going to die that night. No further questions were asked. 
She was not asked to identify the type of weapon, and the record contains no other
relevant evidence on that point. 
          In summary, we have evidence before us that the victim believed the item was a gun
and that she feared for her life. This case was tried on the theory that a firearm was used
in the crime. When the State alleges and proves that a weapon falls within this category,
it is not necessary to verify that the object was really capable of causing death. Thomas
v. State, 821 S.W.2d 616, 620 (Tex. Crim. App. 1991); see also Grant v. State, 33 S.W.3d
875, 881 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (no requirement that firearm be
loaded to support deadly weapon finding).
          We recognize that the term "gun" may be a much broader term than "firearm" when
taken out of context and may include such nonlethal instruments as BB guns, blow guns,
pop guns, and grease guns. See O'Briant v. State, 556 S.W.2d 333, 335–36 (Tex. Crim.
App. 1977). Courts have also recognized, however, that the fact-finder may draw
reasonable inferences and make reasonable deductions from the evidence as presented
to it within the context of the crime. See Goodin v. State, 750 S.W.2d 857, 859 (Tex.
App.—Corpus Christi 1988, pet. ref'd). Absent any specific indication to the contrary at
trial, the jury may make the reasonable inference, from the victim's testimony, that a "gun"
was used in the commission of a crime and that the gun was a firearm. See Wright v.
State, 591 S.W.2d 458 (Tex. Crim. App. [Panel Op.] 1979); Joseph v. State, 681 S.W.2d
738, 739 (Tex. App.—Houston [14th Dist.] 1984, no pet.). Davis' threats against Phelps
with the gun suggest it was a firearm rather than merely a gun of the nonlethal variety. See
Edwards v. State, 10 S.W.3d 699, 701 (Tex. App.—Houston [14th Dist.] 1999), pet. ref'd,
improvidently granted, 67 S.W.3d 228 (Tex. Crim. App. 2002); Benavides v. State, 763
S.W.2d 587, 589 (Tex. App.—Corpus Christi 1988, pet. ref'd).
          Further, the evidence that Davis committed the assaults in the second transaction,
and that he did so with a firearm, provides support for the inference that the device he
carried during his kidnapping and robbery of Phelps was also a firearm.
          Applying the evidentiary review standards set out above, we also find there is legally
and factually sufficient evidence to allow the jury to conclude Davis used a firearm in the
commission of these crimes, and there is nothing beyond supposition or guesswork to
suggest the contrary. 
CONCLUSION
          In summary, we hold that no error has been shown in the trial court's failure to
suppress Phelps' identification of Davis' voice, that the evidence of his identification is
legally and factually sufficient, and that the evidence supporting the jury's deadly weapon
findings is sufficient.
          Accordingly, we affirm the judgment.


                                                                           Donald R. Ross
                                                                           Justice

Date Submitted:      September 27, 2005
Date Decided:         November 21, 2005

Publish